# EXHIBIT "A"

ASSESSMENT OF DAMAGES
HEARING IS REQUIRED

**THORP REED & ARMSTRONG, LLP**
BY: IRA B. SILVERSTEIN
I.D. No. 17658
One Commerce Square
2005 Market Street, Suite 2010
Philadelphia, PA 19103
(215) 563-6711

THIS IS NOT AN ARBITRATION CASE

Attorney for Plaintiffs
STEP Plan Services, Inc. et al.

STEP PLAN SERVICES, INC.
100 Grist Mill Road
Simsbury, CT 06070

WAYNE H. BURSEY
100 Grist Mill Road
Simsbury, CT 06070

BENISTAR ADMIN SERVICES, INC.
100 Grist Mill Road
Simsbury, CT 06070

BENISTAR INSURANCE GROUP, INC.
100 Grist Mill Road
Simsbury, CT 06070

BENISTAR 419 PLAN SERVICES, INC.
100 Grist Mill Road
Simsbury, CT 06070

    Plaintiffs

     v.

JOHN J. KORESKO, 5TH, LAWRENCE
KORESKO, KORESKO & ASSOCIATES,
P.C., KORESKO FINANCIAL, L.P. and
PENN-MONT BENEFIT SERVICES, INC.
200 W. Fourth Street
Bridgeport, PA 19405

COURT OF COMMON PLEAS
PHILADELPHIA COUNTY
CIVIL ACTION

MARCH TERM, 2004
NO. 007718

COMMERCE PROGRAM

JURY DEMAND

P0033740.DOC

CAPITAS FINANCIAL, LLC
815 Interchange Building
600 South Highway 169
Minneapolis, MN 55426

ANDERSON KILL & OLICK, P.C.
1251 Avenue of the Americas
New York, NY 10020

VIRGINIA I. MILLER
c/o ANDERSON KILL & OLICK
1600 Market Street
Philadelphia, PA 19103

COMMUNITY TRUST COMPANY, and
LOWELL R. GATES,
3907 Market Street
Camp Hill, PA 17011

ARROW DRILLING CO., INC., and
NESTOR GARZA, JR.
P.O. Box 505
Benavides, TX 78341

                    Defendants.

## SECOND AMENDED COMPLAINT

| NOTICE | AVISO |
|---|---|
| You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you. | Le han demandado a usted en la corte. Si usted quiere defenderse de estas demandas expuestas en las paginas siguientes, usted tiene viente (20) dias de plazo al corte en forma escrita sus defensas or sus objeciones alas demandas en contra de sue persona. Sea a visado que si usted no se defiende, la corte tomara mededas y puede continuar la demanda en contra suya sin previo a viso o notificaction. Ademas, la corte pueda decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda. Yested puede perder cinero o sus propiednnes o otros de rechos importantes para usted. |
| YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP. | LLEYE ESTA DEMANDA A UK ABOGADO IMMEDIATEMENTIC, SI NO TIENE ABOGADO 0 SI NO TIENE EL DINER0 SUFICIENTE DE PAGAR TAL SERVICIO, VAYA EN PERSONA 0 LLAME POR TELEFONO A LA OFICINA BUYA DJR?XCJON SE ENCUENTRA ESCRITA ABAJO PARA AVERIGUAR DOh'DE SE PUEDE CONSEGUIR ASISTENCIA LEGAL. |

Lawyer Reference Service
One Reading Center
Philadelphia, PA 19107
215-238-1701

Servido de Referencia Legal
Uno Reading Centro
Filadelfia, PA 19107
215-238-1701

**THORP REED & ARMSTRONG, LLP**
BY:  IRA B. SILVERSTEIN
I.D. No. 17658
One Commerce Square
2005 Market Street, Suite 2010
Philadelphia, PA 19103
(215) 563-6711

Attorney for Plaintiffs
STEP Plan Services, Inc. et al.

| | | |
|---|---|---|
| STEP PLAN SERVICES, INC.<br>100 Grist Mill Road<br>Simsbury, CT  06070 | : <br>: <br>: | COURT OF COMMON PLEAS<br>PHILADELPHIA COUNTY<br>CIVIL ACTION |
| | : | |
| WAYNE H. BURSEY<br>100 Grist Mill Road<br>Simsbury, CT 06070 | : <br>: <br>: | MARCH TERM, 2004<br>NO. 007718 |
| | : | |
| BENISTAR ADMIN SERVICES, INC.<br>100 Grist Mill Road<br>Simsbury, CT 06070 | : <br>: <br>: | COMMERCE PROGRAM<br><br>JURY DEMAND |
| | : | |
| BENISTAR INSURANCE GROUP, INC.<br>100 Grist Mill Road<br>Simsbury, CT 06070 | : <br>: <br>: | |
| | : | |
| BENISTAR 419 PLAN SERVICES, INC.<br>100 Grist Mill Road<br>Simsbury, CT 06070 | : <br>: <br>: | |
| | : | |
| Plaintiffs | : <br>: | |
| | : | |
| v. | : <br>: | |
| | : | |
| JOHN J. KORESKO, 5TH, LAWRENCE<br>KORESKO, KORESKO & ASSOCIATES,<br>P.C., KORESKO FINANCIAL, L.P. and<br>PENN-MONT BENEFIT SERVICES, INC.<br>200 W. Fourth Street<br>Bridgeport, PA 19405 | : <br>: <br>: <br>: <br>: <br>: <br>: | |
| | : | |
| CAPITAS FINANCIAL, LLC<br>815 Interchange Building<br>600 South Highway 169<br>Minneapolis, MN  55426 | : <br>: <br>: <br>: | |
| | : | |
| ANDERSON KILL & OLICK, P.C. | : | |

```
1251 Avenue of the Americas          :
New York, NY  10020                  :
                                     :
VIRGINIA I. MILLER                   :
c/o ANDERSON KILL & OLICK            :
1600 Market Street                   :
Philadelphia, PA 19103               :
                                     :
COMMUNITY TRUST COMPANY, and         :
LOWELL R. GATES,                     :
3907 Market Street                   :
Camp Hill, PA 17011                  :
                                     :
ARROW DRILLING CO., INC., and        :
NESTOR GARZA, JR.                    :
P.O. Box 505                         :
Benavides, TX  78341                 :
                                     :
            Defendants.              :
```

---

## SECOND AMENDED COMPLAINT

### Parties

1.  Plaintiffs are:

    a)      STEP Plan Services, Inc. ("STEP Services" or "STEP"), a Delaware

corporation with its principal place of business located at 100 Grist Mill Road, Simsbury,

Connecticut 06070. STEP Services is the Plan Sponsor of the STEP Plan & Trust f/k/a the

STEP Multiple Employer Supplemental Benefit Plan & Trust (the "STEP Plan"). The

STEP Plan is a multiple employer welfare benefit plan designed to comply with the

requirements of Section 419A(f)(6) of the Internal Revenue Code. STEP Services does not

conduct business in the Commonwealth of Pennsylvania but is a registered foreign business

corporation in Pennsylvania pursuant to 15 Pa.C.S. § 4124.

b)    Wayne H. Bursey ("Mr. Bursey"), the President of STEP Services and Benistar Services with a principal place of business located at 100 Grist Mill Road, Simsbury, Connecticut 06070.

c)    Benistar Admin Services, Inc. ("Benistar Admin") administers the Benistar Plan. It does not conduct business in the Commonwealth of Pennsylvania but is a registered foreign business corporation in Pennsylvania pursuant to 15 Pa.C.S. § 4124.

d)    Benistar Insurance Group Inc. ("BIGI") has nothing to do with administration of the Benistar Plan or STEP Plan but was sued by Koresko in the Sanchez & Daniels Action and the Illinois Action without any basis. BIGI does not conduct business in the Commonwealth of Pennsylvania but is a registered foreign business corporation in Pennsylvania pursuant to 15 Pa.C.S. § 4124.

e) Benistar 419 Plan Services, Inc. ("Benistar Services"), has  its principal place of business at 100 Grist Mill Road, Simsbury, Connecticut 06070. Benistar Services is the Plan Sponsor of the Benistar 419 Plan & Trust (the "Benistar Plan"), a multiple employer welfare benefit plan designed to comply with the requirements of Section 419A(f)(6) of the Internal Revenue Code. Benistar Services does not conduct business in the Commonwealth of Pennsylvania but is a registered foreign business corporation in Pennsylvania pursuant to 15 Pa.C.S. § 4124.(For ease of reference, all of the Benistar Entities are often referred to herein as "Benistar").

2.  Defendants are:

a)    John J. Koresko, V ("Koresko"), a Pennsylvania citizen with a business address of 200 West 4th Street, Bridgeport, Pennsylvania 19405. Koresko is a licensed

attorney and certified public accountant. He ultimately controls, either directly or

indirectly, defendants Penn-Mont Benefit Services, Inc., Koresko Financial, L.P.

and Koresko & Associates, P.C.;

b)    Lawrence Koresko, a Pennsylvania citizen with a business address of 200 West

4th Street, Bridgeport, Pennsylvania 19405. Lawrence Koresko is Koresko's

brother and, with respect to the matters at issue, has at all times been an agent and

representative of Koresko and the entities Koresko controls;

c)    Koresko & Associates, P.C. (the "Koresko Law Firm"), a Pennsylvania

professional corporation with a principal place of business located at 200 West 4th

Street; Bridgeport, Pennsylvania 19405. The Koresko Law Firm is controlled,

directly or indirectly, by Koresko;

d)    Koresko Financial, L.P. ("Koresko Financial"), a Pennsylvania limited

partnership with a principal place of business located at 500 North Gulph Road,

Suite 110, King of Prussia, Pennsylvania 19406 and/or 200 West 4th Street,

Bridgeport, Pennsylvania 19405. Koresko Financial, whose general partner is

Penn-Mont Benefit Services, Inc., is an insurance agency and/or brokerage firm

ultimately controlled by Koresko and Lawrence Koresko;

e)    Penn-Mont Benefit Services, Inc. ("Penn-Mont"), a Pennsylvania corporation

with a principal place of business located at 200 West 4th Street, Bridgeport,

Pennsylvania 19405. Penn-Mont is an employee benefits firm that sponsors

various multiple employer welfare benefit and retirement plans, including the

Regional Employers' Assurance Leagues Voluntary Employees' Beneficiary

Association Trust (the "REAL VEBA"). Penn-Mont is a direct competitor of

STEP and Benistar by virtue of Penn-Mont's sponsorship of various multiple employer welfare benefit plans. The REAL VEBA competes directly with the STEP Plan and the Benistar Plan. Penn-Mont is controlled, directly or indirectly, by Koresko and Lawrence Koresko;

f)      Capitas Financial, LLC ("Capitas"), a Minnesota limited liability company with a principal place of business at 815 Interchange Building, 600 South Highway 169 Minneapolis, MN 55426-1219. Capitas is an association of life insurance brokers. Koresko Financial is a Capitas "partner" and Penn-Mont is a Capitas "preferred provider." On information and belief, Lawrence Koresko is a partner in Capitas. With respect to all matters at issue in this complaint, Koresko, Lawrence Koresko, Koresko Financial, Penn-Mont and the Koresko Law Firm have acted as agents of Capitas;

g)      Anderson Kill & Olick, P.C. ("Anderson Kill"), a national law firm with an office at 1600 Market Street, Philadelphia, Pennsylvania. At various times relevant to this Complaint, Anderson Kill has represented defendants Koresko, the Koresko Law Firm, Penn-Mont, Arrow Drilling Co., Inc., and Sanchez & Daniels in conjunction with Koresko's efforts to improperly advance his competitive position vis-à-vis STEP Services;

h)      Virginia I. Miller, an attorney in Anderson Kill's Philadelphia office. Ms. Miller has had primary responsibility for Anderson Kill's representation of Koresko, the Koresko Law Finn, Penn-Mont, Arrow Drilling Co., Inc., and Sanchez & Daniels;

i)      Community Trust Company ("Community Trust"), a Pennsylvania company headquartered at 3907 Market Street, Camp Hill, Pennsylvania.  Community Trust acts as a trustee for Penn-Mont benefit plans, including the REAL VEBA;

j)      Lowell R. Gates, a Pennsylvania resident with a business address at 3907 Market Street, Camp Hill, Pennsylvania.  Mr. Gates is the Community Trust principal with primary responsibility for Koresko-related matters;

k)      Arrow Drilling Co., Inc., ("Arrow Drilling"), a Texas corporation with offices at P.O. Box 505, Benavides, Texas 75341.  Arrow Drilling was a participating employer in the Benistar Plan;

l)      Nestor Garza, Jr., a Texas resident with offices at P.O. Box 505, Benavides, Texas 78341.  Mr. Garza is a principal of Arrow Drilling.

### Jurisdiction and Venue

3.  Jurisdiction and venue are appropriate in Philadelphia County as substantial transactions and occurrences took place within the county out of which the causes of action set forth below arose.

### Background

4.  The STEP Plan and Benistar Plan are multiple employer welfare benefit plans designed to comply with the requirements of Section 419A(f)(6) of the Internal Revenue Code.  "419 Plans" are utilized primarily by small business owners, professional partnerships and other closely held businesses to reduce their taxable income while at the same time providing health and welfare benefits to their employees.  Employers' contributions to these plans are tax-deductible and not reportable as current income to the plan participants (*i.e.,* employees and/or their beneficiaries).  Typically, 419 Plans use the contributions, in part, to purchase

insurance policies from insurance carriers to "reinsure" the contingent liability owed to the employee or beneficiary for severance or death benefits. Upon a severance or death event, the plan collects on the insurance policy or borrows the cash value from the policy, and pays out its contractual commitment to the employee (in the case of severance) or employee's beneficiary (in the case of death). Such payments are generally tax-advantaged to the employee and/or his beneficiary.

5. In recent years, the number of 419 Plans has been reduced because the Internal Revenue Service ("IRS") has challenged some of these plans as offering "deferred compensation in disguise," which, if true, might render their professed tax benefits invalid. In light of these concerns, there are currently only a handful of bona fide 419 Plans in the United States.

6. The STEP Plan (which offers severance and death benefits) is a bona fide 419 Plan and, prior to the events alleged herein, had over $200 million of life insurance policies in force. Plaintiff STEP Services is the Plan Sponsor of the STEP Plan.

7. The Benistar Plan is a bona fide 419 Plan with over $12 billion of life insurance in force backing up its $10 billion in death benefit promises. At all relevant times, there were several hundred participating employers in the Benistar Plan.

8. One of the few competitors of the STEP Plan and Benistar Plan is the "REAL VEBA," a plan sponsored by defendant Penn-Mont and trusted by defendant Community Trust.

9. In a marketing circular dated October 21, 2001, and distributed to its insurance brokers across the country, The Hartford Life Insurance Company ("The Hartford") listed both the STEP Plan, the Benistar Plan and the REAL VEBA, *inter alia,* as 419 Plans in which The Hartford made its life insurance products "available for use." Endorsements of 419 Plans

by large insurance carriers, like The Hartford, are integral to the success of any 419 Plan because the plans are not marketed directly to consumers (*i.e.,* employers or participants), but rather through licensed insurance brokers and financial advisors. In other words, the "direct customer" in the 419 Plan market is the insurance broker who recommends the plan to the employer, the "ultimate customer."

10. Koresko, through his interest in the Penn-Mont REAL VEBA plan, competes directly with Plaintiffs in marketing 419 Plans to insurance brokers and in securing insurance companies who will make their policies available to reinsure 419 Plan benefits.

### Koresko Initiates His Unlawful Scheme
### To Remove STEP and Benistar as Competitors

11. STEP Services took over the administration of the STEP Plan in February 2002 and, together with its affiliate company, Benistar, vaulted ahead of all other competitors in the 419 Plan market.

12. In response to the growth of STEP/Benistar, Koresko, Penn-Mont's founder, began to make defamatory and disparaging remarks about STEP Services and Benistar to other 419 Plans, to various insurance carriers such as The Hartford, to insurance brokers across the country, and even to federal government officials. In making these defamatory and disparaging remarks, Koresko was acting individually and as an officer, director and/or partner of Penn-Mont, Koresko Financial and the Koresko Law Firm (collectively, "the Koresko Institutional Defendants").

13. When the IRS issued new proposed regulations governing 419 Plans in July 2002, Koresko used the event to further defame STEP and Benistar in the marketplace by falsely claiming to insurance carriers and brokers across the country that the STEP and Benistar

plans did not conform to the new proposed regulations. Specifically, Koresko made defamatory and disparaging remarks to The Hartford about STEP and Benistar. Koresko alleged not only that STEP and Benistar failed to comply with the new proposed IRS regulations, but, also cast aspersions on (i) the manner in which STEP Services and Benistar marketed the plans; (ii) the deductibility of contributions made to the plans; (iii) other matters regarding the operations of STEP Services and Benistar; and (iv) the "bona fides" of the STEP and Benistar Plans. The comments and communications defamed, disparaged and damaged STEP Services and the STEP Plan in the 419 Plan and insurance brokerage markets.

14. As a result of the defamatory and disparaging comments made to The Hartford by Koresko, The Hartford - in a marketing circular dated August 12, 2002 sent to brokers of The Hartford across the country - announced that "[e]ffective immediately, The Hartford will not accept any new business written in connection with the Benistar 419 Plan."

**Koresko Begins Soliciting Nominal Plaintiffs to Bring Frivolous Lawsuits Against
Benistar and STEP and Secures the Help of the Anderson Kill Defendants**

15. Unsatisfied with the damage being done to STEP Services and Benistar by his defamatory statements, Koresko determined to use his dual role as a competitor and an attorney to further wrongfully impede the ability of STEP Services and Benistar to compete with Penn-Mont. He commenced soliciting current and/or former employers and participants in the STEP Plan and Benistar Plan to act as plaintiffs in frivolous and vexatious litigation against STEP Services and Benistar. Upon information and belief, Koresko did not disclose his dual role to the solicited employers and participants when making the solicitations. Additionally, Koresko tortiously interfered with the contractual relationships that STEP and Benistar had with their respective participating employers.

16. To further this scheme, Koresko obtained the aid and assistance of defendants Anderson Kill and Miller (together the "Anderson Kill Defendants"). The Anderson Kill Defendants agreed to act as co-counsel in the litigation Koresko brought and agreed to take direction from Koresko, as opposed to the named parties they claimed to represent, as well as split any recoveries between themselves.

17. In the course of these representations, the Anderson Kill Defendants knowingly asserted inconsistent and frivolous positions. As one example, in defending Koresko against a Department of Labor investigation of his misconduct, Anderson Kill maintained that 419 Plans are not subject to ERISA; however, when filing lawsuits against STEP Services and Benistar, the Anderson Kill Defendants have insisted that ERISA applies.

**Anderson Kill Must Have Known That Koresko's Planned Litigation Against STEP and Benistar Was Designed Primarily to Benefit Koresko's Personal Business Interests as Opposed to the Nominal Clients -- Filing Lawsuits on Behalf of the REAL VEBA for Personal Financial Gain is a Common Practice for the Koresko Defendants and Anderson Kill Defendants**

18. In addition to "representing" the nominal plaintiffs solicited by Koresko, the Anderson Kill Defendants represented Koresko and the Koresko Institutional Defendants and the REAL VEBA. Upon information and belief, the Anderson Kill Defendants must have known that the litigation was designed primarily to benefit Koresko's personal business interests as opposed to the interests of the nominal clients.

19. Filing lawsuits on behalf of REAL VEBA for personal financial gain is common practice for the Koresko, Lawrence Koresko and the Koresko Institutional Defendants (collectively, "the Koresko Defendants") with the aid and assistance of the Anderson Kill Defendants. For example, the Koresko Defendants, via the Anderson Kill Defendants, filed a declaratory judgment action against Gretchen Castellano, a Florida widow who sought

death benefits under a life insurance policy purchased on behalf of Mrs. Castellano's

husband (a participant of REAL VEBA) by the Koresko Defendants through REAL VEBA.

*See Regional Employers' Assurance Leagues Voluntary Employees' Beneficiary*

*Association Trust v. Castellano et al.*, No. 03-CV-6903 (E.D. PA.).  Rather than pay the

benefits clearly provided for under the policy, the Koresko Defendants first tried to coerce

Mrs. Castellano to take a lesser sum, but when she retained counsel and resisted, they filed

suit in Pennsylvania seeking a declaratory judgment denying her any benefits.

20.  Upon information and belief, the treatment of Mrs. Castellano is part of a pattern and

practice engaged in by the Koresko Defendants, with the assistance of the Anderson Kill

Defendants, to deprive beneficiaries of their rightful benefits so that the Koresko

Defendants can skim exorbitant administrative and legal fees out of the trust supposedly

being managed for the benefit of the participants and their beneficiaries.

**Koresko Secures the Cooperation of Arrow Drilling and Garza to Sue Benistar ("Arrow Litigation") and the Chicago Law Firm of Sanchez & Daniels and Its Named Partners to Sue STEP Services ("Sanchez & Daniels Action/Illinois Action")**

21. The Koresko Defendants ultimately secured the cooperation of Defendants Arrow

Drilling and its principal Garza (collectively, "Arrow") to sue the Benistar companies and

also secured the participation of the Chicago law firm of Sanchez & Daniels, Manuel

Sanchez and John Daniel (collectively, "Sanchez & Daniels") to sue STEP Services.  Arrow

and Sanchez & Daniels agreed to serve as nominal plaintiffs.  Upon information and belief,

Arrow and Sanchez & Daniels were not required to pay for the litigation and were promised

lucrative benefits to serve as nominal plaintiffs.  The Anderson Kill Defendants assisted in

this effort by agreeing to represent Arrow and Sanchez & Daniels along with Koresko.

22. Koresko and Anderson Kill even filed suit on behalf of a party who had <u>not</u> authorized the litigation. Koresko and the Anderson Kill Defendants claimed to represent Palm Valley Health Care, Inc. ("Palm Valley"), a participant-employer in the Benistar Plan. Palm Valley was solicited by Koresko but Palm Valley never authorized litigation to be commenced in its name. Despite its almost immediate refutation of its authorization, Koresko and the Anderson Kill Defendants refused to withdraw Palm Valley as a plaintiff until many months later and only in the face of possible sanctions.

23. Having succeeded in convincing at least two participating employers in the STEP and Benistar Plans - out of hundreds solicited in mass mailings and through insurance brokers - to lend their names to planned litigation, Koresko sent a demand letter dated September 23, 2002 to STEP Services and Benistar. The letter leveled various scurrilous and frivolous accusations against the Benistar Plan and the STEP Plan and threatened litigation if STEP Services and Benistar failed to transfer certain plan assets in accordance with Koresko's wishes to defendant Community Trust. The demanded transfers would, effectively, serve to move the assets to Koresko's control at defendant Community Trust and position Koresko's companies to supplant STEP Services as the employer's 419 Plan provider.

### When Koresko's Attempt at Extortion through Threatened Litigation Fails He Files A Writ on Behalf of the Nominal Plaintiffs and Uses the Potential Litigation as a Defamation Tool

24. When STEP Services and Benistar did not immediately accede to the extortion, Koresko and the Anderson Kill Defendants carried out Koresko's threat by immediately filing suit against STEP Services and the STEP Plan in the Philadelphia Court of Common Pleas by way of Writ of Summons. Koresko and the Anderson Kill Defendants were so cognizant of Koresko's dual role and his interests in this litigation that they actually named Koresko as a

party plaintiff. That case was subsequently removed to the United States District Court for the Eastern District of Pennsylvania. *See Koresko and Sanchez & Daniels v. Wayne Bursey et al.*, Court of Common Pleas, No. 02-003936 and No. 2:02-cv-08213-LDD (E.D. Pa.) ("Sanchez & Daniels Action").

25. Even though no complaint was filed until December 3, 2002, in mid-October 2002, Koresko, acting both individually and within the scope of his authority and as officer, director, and/or partner of the Koresko Institutional Defendants, sent an email to The Hartford stating:

> • "The complaint [in Pennsylvania] has not yet been filed . . . It will contain counts for Breach of Fiduciary Duty and Deceptive Insurance Trade Practices . . ."

> • "Carpenter is in serious trouble on this. Jefferson Pilot we believe is involved up to their necks. I hope Hartford has not been involved . . ."

> • "As Hartford has banned the Benistar boys I would suggest a protective step -1 think that Hartford ought to demand Benistar transfer Hartford related STEP Plan assets to another fiduciary." (Emphasis added).

> • "You guys have already made a good first step."

26. As a direct consequence of Koresko's actions, on October 7, 2002, The Hartford sent an email to brokers across the country announcing a marketing teleconference it planned to hold on "419 Plans" and such email omitted any mention of the STEP and Benistar Plans as possible 419 Plans for Hartford brokers to use in the upcoming year end busy season.[1]

---

[1] The last calendar quarter is the busiest time of the year in the 419 Plan and insurance brokerage markets as employers and individuals adopt benefits, insurance and tax strategies before December 31st.

27. Concerned about The Hartford's "termination" of the Benistar Plan (and by implication the STEP Plan as well), STEP Services and Benistar scheduled a meeting at The Hartford's offices on October 15, 2002 with The Hartford's representatives.

28. At the meeting, Wade Seward (The Hartford's Assistant Vice President of Individual Life Market Conduct & Compliance) asked, "What's going on with the Pennsylvania litigation?," even though the Pennsylvania complaint had not yet been filed.

29. Following the October 15th meeting, in a letter dated November 19, 2002, The Hartford advised Benistar that it was rescinding its prior "termination" of the Benistar Plan and, consequently, would "issue new policies to the Benistar 419 Plan." The Hartford reiterated its decision in a letter to Benistar dated November 25, 2002 that stated that "[e]ffective immediately, The Hartford is now accepting applications for business written in connection with the Benistar 419 Plan."

30. On November 14, 2002, at a public hearing on the proposed final 419 Plan regulations held at the Internal Revenue Service in Washington, D.C., Koresko, acting both for his own benefit and the benefit of the Koresko Institutional Defendants, made further defamatory and disparaging remarks in public about STEP Services and Benistar.

**Koresko Takes His Scheme Further by Using the Sanchez & Daniels Action to Obtain a Baseless *Ex Parte* TRO that Effectively Shuts Down STEP and Benistar During Its "High" Season Causing Millions in Damages**

31. During the first week of December 2002, Koresko and the Koresko Law Firm, with the aid and assistance of the Anderson Kill Defendants determined to use the case initiated on behalf of Sanchez & Daniels to seek to shut down STEP Services and the STEP Plan. They sought and obtained an *ex parte* temporary restraining order ("TRO") against STEP Services and the STEP Plan on December 3, 2002. The TRO was issued by Judge Legrome

Davis of the United States District Court for the Eastern District of Pennsylvania and was

obtained by "sharp practice," designed to prevent STEP Services from being effectively

represented by not providing meaningful or timely notice. Moreover, Koresko, Miller and

Anderson Kill misrepresented or hid Koresko's dual status (as an attorney and competitor of

STEP Services) from the court. The TRO was timed to inflict maximum damage upon

STEP Services, as the end of the year is the peak season for sale of 419 Plans.

32. The TRO was also obtained under false pretenses and the misrepresented guise of an

emergency regarding certain life insurance policies that had already been surrendered a year

and half before the TRO was requested. The nominal plaintiff, Sanchez & Daniels, had

voluntarily terminated from the STEP Plan in March 2001 after having had constructively

withdrawn from the STEP Plan by failure to contribute after 1999. The policies at issue in

the TRO had been surrendered with Sanchez & Daniels' knowledge and consent in July

2001. Moreover, although the action had been instituted by writ of summons in September

of 2002, the Defendants made no effort to prosecute the claim before seeking the

"emergency" *ex parte* TRO in December. The fax from Miller and Koresko announcing

that they would be seeking the TRO was sent late in the evening the day before to Wayne

Bursey, the president of STEP Services, who was scheduled to undergo cancer surgery the

very next day. Literally, Mr. Bursey was on the operating table at the time Miller was

obtaining the *ex parte* TRO under false pretenses.

33. The *ex parte* TRO had the effect of essentially shutting down STEP Services and

Benistar during one of the busiest months of the year (December) in the 419 Plan market.

The existence of the TRO caused damage to STEP Services and the STEP Plan in terms of

lost business, both with respect to future business and the cancellation of existing business.

34. The complaint filed along with the request for the TRO contained numerous false, misleading and defamatory statements, and sought, *inter alia*, removal of STEP Services as the fiduciary of the STEP Plan, and transfer of the STEP Plan's assets from J.P. Morgan Chase Bank (one of the largest banks in the world) to defendant Community Trust.  Upon information and belief, Community Trust, which serves as the trustee of REAL VEBA assets, was informed by Koresko that he was commencing litigation, ostensibly on behalf of others but, in reality, on his own behalf and on behalf of the companies he controlled, with the hope of having STEP Plan assets transferred to the control of Koresko's companies for the mutual benefit of Koresko and Community Trust.

35. Community Trust agreed to support this plan of action by agreeing to serve as trustee of any transferred assets.

36. Still not satisfied with the damage he had wreaked, Koresko commenced exploiting the *ex parte* TRO as purported proof of his defamatory statements concerning STEP Services and Benistar.  As Koresko boasted to his nominal clients after informing them of his success in obtaining the *ex parte* TRO, "I honestly believe there will be a settlement . . . [t]he insurance companies and Mellon Trust are going to get very disturbed. **I have something quite nuclear in store.**" (emphasis added).  Koresko was alluding to the next phase of his plan to hurt STEP Services and Benistar-- use the *ex parte* TRO to ruin Plaintiffs' reputation in the business community and interfere with its various present and future business relationships.

37. Koresko, acting both individually and within the scope of his authority as officer, director, and/or partner of the Koresko Institutional Defendants, began sending disparaging and false communications to insurance carriers, insurance brokers, other persons across the

country involved in the 419 Plan industry, and even federal government officials. The communications contained false, misleading, disparaging and defamatory statements about STEP Services and Benistar, as well as misstatements regarding the TRO. Koresko and Miller attempted to use the conditioned privilege accorded to pleadings filed in court proceedings to mask their commercial defamation of STEP Services and Benistar.

38. On December 9, 2002, Koresko sent an email to Anderson Kill quoting 28 U.S.C. § 664 (theft or embezzlement from employee benefit plan) and § 1956 (money laundering). On December 13th, Koresko forwarded the December 9th email to John Reid, Esq., an attorney at Edwards & Angell, the law firm which serves as outside ERISA counsel to Benistar and STEP Services, after having previously telephoned Attorney Reid to threaten him with criminal prosecution. This email stated:

- "Sorry you couldn't talk to me. I attached some US Code-provisions FYI."
- "The amended complaint is going to show illegal acts that may fall under these provisions."
- "I really wanted to give you guys a way out short of public litigation. The [US. Department of Labor] is most likely going to get involved."

This email reveals the intent of Koresko, the Koresko Law Firm, with the aid and assistance of the Anderson Kill Defendants, to file frivolous, vexatious and sham litigation against STEP Services and Benistar: unless STEP Services and Benistar acceded to Koresko's demands. Moreover, by threatening to contact the government and make criminal accusations to gain an advantage in a civil proceeding, Koresko engaged in professional and ethical misconduct in the practice of law.

39. On December 16, 2002 -and unbeknownst to STEP Services and Benistar - Koresko, acting both individually and within the scope of his authority as officer, director, and/or

partner of the Koresko Institutional Defendants, sent an email to Patrick Smith at The

Hartford. This email, entitled "Notice of Litigation Against Benistar, STEP, etc.," stated:

- "You will recall our discussion a few months ago regarding the pending claims my clients have against BENISTAR/STEP. We had reason to believe that Daniel Carpenter, an agent of Hartford and Jefferson-Pilot was looting STEP assets ... I told you and your colleagues about this and requested that you pass the information onto the appropriate parties. You requested updates as the litigation progressed. According to our inquiry, CARPENTER'S activities continued."

- "Although you originally barred Hartford agents from doing business with BENISTAR, Hartford changed its policy not long ago and continued to [do] business with BENISTAR."

- "A class action lawsuit was filed against BENISTAR and the fiduciaries associated with the STEP Plan. I sent you a copy of the TRO memo in this case. A preliminary injunction hearing is scheduled for Jan. 13, 2003."

- *"I hope we can count on your co-operation.* You obviously know that we will be seeking rescission of any misapplied assets and the marshalling of same. Perhaps you can advise Hartford to stipulate to a consent order to that effect and other relief." (Emphasis added).

- "The Boston Globe reported on December 12 that BENISTAR and CARPENTER had a $9 million judgment entered against them . . . We are preparing to file a class action suit today on behalf of all [Benistar 419 Plan] participants to appoint a receiver for those plans, to marshall [sic] the assets, to rescind, and for other relief."

- "We wish to take discovery on an expedited basis. Basically, we want the files on all BENISTAR cases . . . placed within the last 6 years. . We also want documentation referencing STEP, BENISTAR, BENISTAR 419 Plan Services, Inc., Benistar Administration Services, Inc., BENISTAR STEP Plan Services, Inc., BENISTAR 419 Plan (& Trust), BENISTAR Advantage 419 Plan (& Trust), Advantage (419 Plan), and CARPENTER. Please tell me if you will voluntarily cooperate."

- "We hereby request that Hartford freeze all policies that reflect ownership by any of the BENISTAR companies or trusts."

40. As a direct consequence, on December 23, 2002, in a marketing notice sent to Hartford

brokers across the country, The Hartford announced the following:

- "Benistar 419 Plans: The Hartford Not Accepting New Business" (emphasis in original).
- "Please be advised, The Hartford is not accepting any business written in connection with the Benistar 419 Plan."

41. Although the body of this notice refers only to the Benistar 419 Plan, the title refers to "Benistar 419 Plans," which had the effect in the 419 Plan market of alerting Hartford brokers across the country not to do business with Benistar, the Benistar 419 Plan or the STEP Plan.

42. In a letter faxed to Benistar on December 23, 2002, The Hartford shocked STEP Services and Benistar by reinstating its termination of Benistar and all of the 419 Plans administered by Benistar:

- "In light of recent developments involving various Benistar entities and principals of these entities, we have decided that Hartford Life Insurance Company and Hartford Life and Annuity Insurance Company will no longer accept business in connection with *Benistar 419 plans.*" (Emphasis added).
- "Our previous letters of November 19, 2002 and November 25, 2002 are no longer effective and may not be used by Benistar as reflecting Hartford's position."

**In December 2002, Koresko and Anderson Kill Decide to Operate on Two Fronts And File a "Copy Cat" Lawsuit Against Benistar on Behalf of Arrow ("Arrow Litigation")**

43. On December 17, 2002, Koresko and the Koresko Law Firm, with the aid and assistance of Miller and Anderson Kill, filed a "copycat" lawsuit on behalf of Arrow, and purportedly Palm Valley (*see* paragraph 22 above), in the Eastern District of Pennsylvania, this time against Benistar Services and Benistar Admin who sponsor and administer the Benistar Plan ("Arrow Litigation"). The complaint in the Arrow Litigation made virtually the same allegations as their previous lawsuit on behalf of Sanchez & Daniels had made against the STEP Plan. *See Arrow Drilling Co., et al. v. Benistar, et al.*, No. 02-CV-9097 (E.D. Pa.).

44. Miller and Anderson Kill also sent a letter to Benistar dated December 17th advising of their intention to seek an enlargement of the ex *parte* TRO to include the Benistar Plan, as well as to seek a receiver over all of the assets of *both* the STEP Plan and the Benistar Plan and the transfer of all such assets from J.P. Morgan Chase Bank (the current trustee of the STEP and Benistar Plans and one of the largest banks in the world) to defendant Community Trust.

45. The damage inflicted upon the Plaintiffs by The Hartford's second "termination," in conjunction with Koresko's dual-pronged litigation assault against STEP/Benistar was, and continues to be, substantial. As a direct and proximate cause of the wrongful acts of the defendants alleged herein, the STEP Plan has lost approximately $12 million in business (including lost profits) and the Benistar Plan has lost approximately $50 million a year in annual revenue from The Hartford, not to mention over $3 million in legal fees caused by the spurious litigation.

### Koresko Expands His Defamation of STEP Services and Benistar in 2003

46. On January 9, 2003, the Honorable Legrome D. Davis of the Eastern District of Pennsylvania held a status conference in the Sanchez & Davis Action. At this status conference, Judge Davis asked Koresko whether, in fact, he was a principal of Penn-Mont and a competitor of Benistar. Koresko not only denied that he was a principal of Penn-Mont (claiming only that he provided "legal services" to Penn-Mont), but he also denied - in response to a pointed query from Judge Davis - that he had sent out numerous communications to insurance carriers and brokers regarding the issuance of the TRO. Anderson Kill, in attendance at this status conference, though aware that the court was being misled, failed to correct the falsehood.

47. The very morning of the January 9th status conference, Koresko, acting both individually and within the scope of his authority as officer, director, and/or partner of the Koresko Institutional Defendants, sent (or instructed Lawrence Koresko to send) an email to an insurance broker that included the following false, defamatory and libelous statements:

- "Anyone who continues to market [the Benistar 419 Plan] should consider his legal liability."

- "Two lawsuits have been filed in Philadelphia naming Daniel Carpenter and his BENISTAR-affiliates as defendants. One involves the Benistar STEP Plan and the other involves the BENISTAR 419 Plans. My clients have been harmed by self-dealing and churning of plan assets."

- "In the STEP case, Benistar lied to clients about their 'options' and fraudulently induced then to churn STEP plan assets and buy new policies in the Benistar 419 Plan."

- "Carpenter has been pulling a ruse in the BENISTAR plan . . .the Benistar plan . . . is void and a fraud."

- "Benistar breached its fiduciary duties by suggesting that people engage in an illegal act as an inducement to participation."

- "The foregoing are uncontroverted facts. That's why a Temporary Restraining Order was issued by the Philadelphia Court."

- "We are seeking additional plaintiffs for the class action to take apart the Benistar plan."

- "Benistar has been contacting clients and offering 'incentives' to keep them from suing. This is unethical and possibly constitutes felony witness tampering."

- "My suggestion to any of your clients is to adopt another welfare plan *with a credible sponsor:* In addition, we respectfully request that any client hire us to represent him in the action to obtain return of the money already sent to BENISTAR." (Emphasis added).

This email was sent virtually at the same time that Koresko sat in the chambers of a federal judge on the afternoon of January 9, 2003, and denied sending (or having knowledge of) any such missives.

48. Koresko also stated in the January 9th email to the insurance broker:

- "Would you want your money controlled by somebody who was found guilty of defalcating $9 million? ... The guy is bad news ... no sane person can ignore that a jury labeled him, his wife, and his partner as thieves. . We could use as many plaintiffs in the case as possible."

49. On January 23, 2003, Judge Davis, after finally learning of Koresko's interests as a competitor and of the other ways in which he was misled into entering the *ex parte* TRO, granted the motion of STEP Services to dissolve the TRO and denied Sanchez & Daniels' application for a preliminary injunction.

50. Despite having trumpeted the TRO as part of his disparagement campaign, neither Koresko nor any of the other defendants sent out communications or informed the recipients of prior communications and emails that the TRO had been dissolved. In fact, in a communication sent after the TRO had been dissolved, Koresko answered queries concerning the TRO in a fashion clearly implying that the TRO was still in effect.

51. On February 4, 2003, Koresko sent proposed "client affidavits" to various insurance brokers. These "client affidavits" made false statements about representations allegedly made by STEP Services and Benistar to induce clients of the brokers to adopt the STEP and Benistar Plans. None of the "clients" would execute the false affidavits and none wished to participate in litigation with Arrow and Sanchez & Daniels.

52. In seeking to have insurance brokers assist him in soliciting "clients" to sue STEP Services and Benistar, Koresko acting both individually and within the scope of his authority as officer, director, and/or partner of the Koresko Institutional Defendants, and as co-counsel with Miller and Anderson Kill, stated to brokers that STEP Services or Benistar "is not a fit trustee," that "the Benistar trust is not set up properly," and that "by helping our

clients join the class action lawsuit we could help them get their entire [contribution] back from Benistar."

53. Koresko also claimed that "he has evidence that Benistar tampered with witnesses with a $100K payoff, *they are bad people and cannot be trusted."* (Emphasis added).

54. When it became apparent that Koresko and Anderson Kill's deceptions had been discovered by the court, in February 2003, Koresko and Anderson Kill filed a notice of voluntary dismissal of the Sanchez & Daniel Action, which was improper because leave of court was required, and, shortly thereafter filed a new, virtually identical complaint in state court in Chicago, Illinois (the case was later removed to the United States District Court for the Eastern District of Illinois) *See John Daniels, et al. v. Wayne Bursey, et al.* No. 03-CV-1550 (N.D. Ill.) ("Illinois Action").  Dismissal of the Sanchez & Daniels case before Judge Davis was not effected until July of 2003.

### The Arrow Case Continued Before Judge Davis But Was Dismissed In Less Than A Year For Lack of Subject Matter Jurisdiction and the Dismissal Was Recently Upheld by the Third Circuit

55.  Like the Sanchez & Daniels Action, the Arrow Litigation asserted all sorts of misconduct with respect to the Benistar Plan, was styled as a class action seeking injunctive relief and damages and was premised on ERISA despite the fact that Koresko and the Anderson Kill Defendants knew that ERISA does not apply to 419 plans.  *See Elaine Chao, Sec'y of Labor v. Koresko,* NO. 04-MC-00074 (MAM) (E.D. Pa.)  (Koresko and the Anderson Kill Defendants argue that the REAL VEBA, a 419 Plan, is not covered by ERISA)  (*See* ¶ 66 below).

56. Shortly after suit commenced, one of the nominal plaintiffs, Palm Valley asserted that it had not authorized the lawsuit. Only some eight months later, in the face of a threatened Rule 11 motion, did Koresko and the Anderson Kill Defendants withdraw Palm Valley as a plaintiff.

57. Moreover, Koresko and the Anderson Kill Defendants were well aware that employers lack standing to sue under ERISA, yet they premised the Arrow Litigation on just such a false premise in order to satisfy ERISA's standing requirements. Incredibly, just two months after filing the Arrow Litigation, Koresko and the Anderson Kill Defendants obtained a dismissal of similar ERISA breach of fiduciary duty claims made against Koresko's 419 Plan based on the plaintiff's status as an employer. *See Reg'l Employers' Assurance Leagues Voluntary Employees' Benefic. Assoc. Trust v. Sidney Charles Markets, Inc.*, 2003 WL 220181 (E.D. Pa. January 29, 2003). They made this argument at the same time that they were arguing the exact opposite position in the Arrow Litigation.

58. The District Court took an exceedingly dim view of the conduct of Koresko and the Anderson Kill Defendants in this regard. On September 23, 2003, Judge Davis dismissed the companion case brought nominally on behalf of Arrow Drilling and Palm Valley. In his written order, Judge Davis found that Koresko engaged in a "Janus-faced argument" and "wasted this Court's time."

59. On March 3, 2005, the Third Circuit affirmed Judge Davis' dismissal of the Arrow litigation for lack of subject matter jurisdiction and that case has now ended.

60. Koresko and Garza have not given up their pursuit of the Benistar Entities and their principals. Suprisingly, despite this case going on for almost two years in Philadelphia, on December 2, 2005, Garza and various family members filed a writ of summons against the

Benistar Entities, certain of their principals and other unrelated defendants in the Court of Common Pleas of Dauphin County. *See Nestor Garza et al v. Daniel Carpenter et al*, Civil Action No. 2005 cv 5060 (CCP Dauphin County). It is unknown on what basis the Garza plaintiffs believe the Dauphin County Court of Common Pleas has jurisdiction to hear a lawsuit brought by residents of Texas against residents of Connecticut. Mr. Garza failed to appear for a deposition that was noticed dually under the Dauphin County case and this case and no complaint has been filed.

### Koresko, Miller and Anderson Kill Continue Their Bad Acts in the "Illinois Action" but Sanchez & Daniels Finally Realize They Are Being Used for Koresko's Own Personal Crusade and End up Suing Koresko While the Illinois Action is Still Pending

61. Koresko, Miller, Anderson Kill and the other defendants continued in their efforts to eliminate STEP Services and Benistar as competitors in the Illinois Action. In that action, Koresko, Miller and Anderson Kill sought to obtain a preliminary injunction of the type that was denied by Judge Davis and also sought certification of a class of plaintiffs even though, despite solicitation, they could get no other STEP Plan participating employer to join in the Sanchez & Daniels Action in the first place. Koresko and Anderson Kill were ultimately unsuccessful in Illinois but only after intensive and expensive litigation.

62. The Illinois Action has now ended by way of settlement but only after Sanchez & Daniels realized that Koresko was using them to further his crusade against a business competitor. Sanchez & Daniels obtained new counsel and sued Koresko while the case was still pending. *See Sanchez & Daniels v. John Koresko and Koresko & Assocs.*, 04-c-5183 (ND Ill). In that case, currently on trial in Chicago, Sanchez & Daniels challenge Koresko's rights to obtain any quantum meruit recover for his "legal services" as the result

of Koresko's various incompetent and wrongful acts against his own clients. Recent sworn testimony in that case supports Plaintiff's allegations here that there was absolutely no basis on which to seek a TRO in the Pennsylvania Action brought on behalf of Sanchez & Daniels by Koresko and Anderson Kill and that the dispute between Sanchez & Daniels and STEP was a contract dispute over approximately $100,000 in surrender value of its policies that had been surrendered 1-1/2 years before the TRO was applied for. Sanchez & Daniels had nothing to do whatsoever with the Benistar Plan. Sanchez testifies, in fact, that there was "no emergency" and the that TRO was a strategy pursued by Koresko and Anderson Kill. Clearly the allegations of "irreparable harm" were manufactured by Koresko for the purposes of obtaining the end of year TRO and not to avert any real irreparable harm to Sanchez & Daniels. The "immediate" and "irreparable harm" argued by Koresko and Anderson Kill was that the insurance policies covering the lives of Sanchez & Daniels' employees would be terminated. In truth, everyone knew or should have known, except for the judge, that the policies at issue had been surrendered 1-1/2 years earlier.

63. Remarkably, Koresko continued his campaign against STEP Services in the Chicago litigation despite having filed a petition to withdraw as counsel in the case. He filed motions in the case without his client's knowledge or consent and even went so far as to try and sabotage his client's settlement, despite the fact that Sanchez & Daniels' new counsel believed there were serious risks both as to the merits of the case and the potential for class certification.

64. The settlement was ultimately achieved despite Koresko's repeated attempts to derail the settlement and his filed objections challenging the settlement as "counsel" to an uncertified, putative class that had no class representative. He then intentionally attached a

copy of the confidential settlement to an unsealed filing whose ostensible purpose was to

challenge the settlement's confidentiality. This resulted in contempt sanctions against

Koresko by the Illinois Court and required further application to the Court by Plaintiffs to

have the filing sealed and to remove the unsealed version from the Court's website, which

was so ordered by the Chicago Court.

65. Miller and Anderson Kill continued to help Koresko in his efforts "behind the scenes"

despite the fact that Anderson Kill withdrew as counsel in May, 2003 due to a conflict of

interest arising from the firm's representation of one of the defendants. Despite Anderson

Kill's withdrawal as counsel, Miller continued to help Koresko in prosecuting the Illinois

Action with no apparent regard to the "duty" owed to her firm's client that presented the

conflict of interest. Miller's continued role in the Illinois Action bolsters the fact that she is

truly a co-conspirator of Koresko's in his campaign to ruin a competitor and not simply his

attorney.

66. Miller also attempted to assist Koresko in scuttling the Chicago settlement by filing a

knowingly false affidavit alleging that an attorney for STEP Services had made disparaging

comments about Koresko in a settlement conference.

**Koresko Continues to be "Janus-faced" by Arguing that ERISA Applies to the Claims He
Brought Against STEP and Benistar While, at the Same Time, Fighting a Department of
Labor Subpoena Directed to Penn-Mont on the Grounds that 419 Plans Are Not Covered
by ERISA**

67. The Koresko Defendants and Anderson Kill Defendants have also continued to be

"Janus-faced." The United States Department of Labor has been investigating Koresko,

Penn-Mont and the REAL VEBA. In aid of their investigation, the Department of Labor

has subpoenaed various documents but Koresko, through Anderson Kill, has challenged the

subpoenas, claiming that his 419 Plans are not covered by ERISA (to the point of sanctions against Koresko and near incarceration). Yet, in the Chicago litigation as well as the dismissed Philadelphia cases, Koresko and Anderson Kill based their claims on the contention that 419 Plans, as long as they are sponsored by competitors, are covered by ERISA.[2]

68.  In addition, Koresko attempted to remove this action to federal court based on alleged ERISA jurisdiction despite the clear state law claims in this case and despite the fact that he well knows that 419 Plans are not subject to ERISA.  The case was remanded by the Honorable Legrome Davis due to the procedural failure to obtain timely and unanimous consent of all defendants, however, in his opinion Judge Davis remarked that he had "serious reservations" about whether subject matter jurisdiction existed absent the procedural defect.  *See STEP Plan Services, Inc. v. Koresko*, Civil Action No. 04-CV-2560 (E.D.Pa.).  This improper removal, which included significant briefing on motions to dismiss filed in the federal court, resulted in fees and costs being awarded to plaintiffs in excess of $20,000.  The Koresko Defendants have failed to pay the fees and costs and, instead, have filed a baseless appeal and motion to stay (without the requisite bond) to further attempt to avoid any payment to plaintiffs for their wrongful removal.

**Damages Summary**

69. As a consequence of the above-described wrongful conduct, Plaintiffs have suffered and continue to suffer substantial harm and damage.

---

[2] Also *See REAL VEBA v. Sidney Charles Markets*, 2003 US. Dist LEXIS 1380 (ED. Pa. Jan. 31, 2003)

70. In addition to over $100 million in business, profits and/or business opportunities lost, Plaintiffs have incurred approximately $3 million in attorneys' fees and costs in defending the sham, vexatious and frivolous claims brought by Koresko, with the aid and assistance of the Anderson Kill Defendants (and with the assistance of the other defendants) on behalf of Sanchez & Daniels and Arrow Drilling.

71. Plaintiffs also seek injunctive relief against the Koresko Defendants, enjoining them from publishing any further disparaging, defamatory or libelous statements (written or oral) against Plaintiffs, their fiduciaries and principals.

## COUNT I
### (Common Law Commercial Disparagement)
### Plaintiffs v. Koresko, Lawrence Koresko and Koresko Institutional Defendants

72. Plaintiffs incorporate and reallege the allegations contained in paragraphs 1 through 69 as if fully set forth herein.

73. The various statements as set forth in detail in the paragraphs above, made by Koresko and Lawrence Koresko, acting both individually and within the scope of their authority as officers, directors, partners and/or agents of the Koresko Institutional Defendants are false, incorrect and untrue statements regarding the quality of Plaintiffs' products and services.

74. Koresko and Lawrence Koresko, acting both individually and within the scope of their authority as officers, directors, partners and/or agents of the Koresko Institutional Defendants, made these statements with actual knowledge that they were false or with reckless disregard as to their truthfulness.

---

(involving a suit between Penn-Mont and a participating employer in the REAL VEBA).

75. In disparaging the qualities of Plaintiffs' products, services and integrity, Koresko and Lawrence Koresko, acting both individually and within the scope of their authority as officers, directors, partners and/or agents of the Koresko Institutional Defendants, sought to (i) gain a competitive advantage over Plaintiffs in the markets; and (ii) put Plaintiffs out of business.

76. Koresko and Lawrence Koresko, acting both individually and within the scope of their authority as officers, directors, partners and/or agents of the Koresko Institutional Defendants and Capitas, revealed the malicious and self-interested nature of their disparaging comments by coupling the false statements with insinuations and actual clear statements that legal liability and financial loss would befall anyone who did not switch to Plaintiffs' competitors.

77. The Koresko Defendants' various false statements are not protected by privilege because judicial privilege does not attach to statements not made in the regular course of judicial proceedings.

78. The Koresko Defendants' various false statements were made outside the course of judicial proceedings to clients of the Plaintiffs, including The Hartford, insurance carriers and brokers, who had no involvement in the frivolous lawsuits and claims initiated by the Koresko Defendants.

79. Judicial privilege does not attach here because the statements were made with malice and with intent of destroying Plaintiffs' reputation and business.

80. Reporting of judicial proceedings to third parties is not protected by judicial privilege.

81. Plaintiffs have been and continue to be greatly injured financially, as well as injured in name and reputation, because of the disparaging statements.

82. As a direct and proximate result of these false statements of fact, many existing and potential insurance carriers and customers of Plaintiffs refrained from doing business with Plaintiffs.

83. Moreover, as a direct and proximate result of these disparaging statements, many insurance brokers advised their clients who would have done business with Plaintiffs not to do so.

WHEREFORE, Plaintiffs respectfully pray for judgment against defendants in an amount in excess of $100,000 in compensatory damages and an amount in excess of $100,000 in punitive damages. Plaintiffs also request such other and further relief, including attorneys' fees and costs, as this Court may deem just and proper.

### COUNT II
### (Defamation Per Se)
**Plaintiffs v. Koresko, Lawrence Koresko and the Koresko Institutional Defendants**

84. Plaintiffs incorporate and reallege the allegations contained in paragraphs 1 through 81 as if fully set forth herein.

85. Koresko and Lawrence Koresko, acting both individually and within the scope of their authority as officers, directors, partners and/or agents of the Koresko Institutional Defendants defamed Plaintiffs by publishing false statements of fact to The Hartford and untold hundreds of insurance carriers, brokers and other third parties across the country. As a result, Plaintiffs have suffered damage to their business and reputation.

86. Specifically, Koresko and Lawrence Koresko, acting both individually and within the scope of their authority as officers, directors, partners and/or agents of the Koresko Institutional Defendants published and told The Hartford and various insurance brokers that, among other things, Plaintiffs were "looting" assets from the STEP Plan, and that the Benistar 419 Plan was "a fraud."

87.    These statements were defamatory because they were intended to and, in fact, did lead the recipients of such statements (including The Hartford, insurance carriers and brokers) to form falsely negative impressions of Plaintiffs, and their products and services.

88.    The false statements of fact about Plaintiffs contained in the various communications published to third parties by Koresko and Lawrence Koresko, acting both individually and within the scope of their authority as officers, directors, partners and/or agents of the Koresko Institutional Defendants constitute defamation per se because the statements were false statements about Plaintiffs' financial position, business methods and operations, and/or accused Plaintiffs of fraud or mismanagement.

89. Koresko and Lawrence Koresko, acting both individually and within the scope of their authority as officers, directors, partners and/or agents of the Koresko Institutional Defendants made these statements knowing they were false or with reckless disregard of the truth.

90. Koresko and Lawrence Koresko, acting both individually and within the scope of their authority as officers, directors, partners and/or agents of the Koresko Institutional Defendants acted with malice and with an intent to destroy the business and reputation of Plaintiffs.

91. Koresko and Lawrence Koresko, acting both individually and within the scope of their authority as officers, directors, partners and/or agents of the Koresko Institutional Defendants made unprivileged publications of the false statements regarding Plaintiffs through a massive campaign of possibly thousands of emails and other communications that identified Plaintiffs by name, and were sent to insurance carriers, brokers and other third parties across the country.

92. Plaintiffs' client, The Hartford, and the insurance carriers, brokers and other third parties to whom the Koresko Defendants published the defamatory statements understood the defamatory statements to apply to Plaintiffs because they terminated and discontinued doing business with Plaintiffs.

93. Plaintiffs suffered special harm as a result of the Koresko Defendants' publication of the defamatory statements in that they lost millions of dollars of revenue and lost profits from the termination and discontinuation of business from The Hartford and third party insurance carriers and brokers.

94. The Koresko Defendants' defamatory statements were not conditionally privileged because they were not made on a proper occasion, from a proper motive, in a proper manner or based upon reasonable cause.

95. The Koresko Defendants made the defamatory statements with malice and with intent to destroy Plaintiffs' reputation and business.

96. These defamatory statements have directly and proximately damaged Plaintiffs.

WHEREFORE, Plaintiffs respectfully pray for judgment against defendants in an amount in excess of $100,000 in compensatory damages and an amount in excess of $100,000 in

punitive damages. Plaintiffs also request such other and further relief, including attorneys' fees and costs, as this Court may deem just and proper.

## COUNT III

### (Aiding and Abetting the Koresko Defendants' Defamation of Plaintiffs)
### Plaintiffs v. Miller and Anderson Kill

97. Plaintiffs incorporate and reallege the allegations contained in paragraphs 1 through 94 as if fully set forth herein.

98. The Koresko Defendants defamed Plaintiffs by numerous publications of false statements of fact that greatly injured Plaintiffs' business reputation and business.

99. As set forth above, Miller and Anderson Kill committed various tortious acts in concert with the Koresko Defendants pursuant to a common design to injure Plaintiffs, their competitor, through the widespread dissemination of defamatory statements. Alternatively, Miller and Anderson Kill gave substantial assistance to Koresko to accomplish his unlawful defamation of Plaintiffs including, *inter alia*, helping him obtain an *ex parte* TRO under false circumstances that could be used in Koresko's defamation campaign and then continue to help pursue the Sanchez & Daniels case in Illinois even after withdrawing as counsel due to a conflict of interest.

100.     As a result of Miller and Anderson Kill's concerted activity with the Koresko Defendants to defame the Plaintiffs and/or the substantial assistance provided to the Koresko Defendants by Miller and Anderson Kill to commit the tortious acts of defamation against the Plaintiffs, Plaintiffs have been significantly damaged.

WHEREFORE, Plaintiffs respectfully pray for judgment against defendants in an amount in excess of $100,000.00 in compensatory damages and an amount in excess of $100,000 in punitive damages. Plaintiffs also request such other and further relief, including attorneys' fees and costs, as this Court may deem just and proper.

## COUNT IV
### (Tortious Interference With Beneficial Business Relationships)
**Plaintiffs v. Koresko, Lawrence Koresko and the Koresko Institutional Defendants**

101.    Plaintiffs incorporate and reallege the allegations contained in paragraphs 1 through 98 as if fully set forth herein.

102.    Plaintiffs had valid and beneficial business relationships with The Hartford, other insurance carriers, insurance brokers and various 419 Plan employers and participants (collectively hereinafter, the "Business Relationship Parties").

103.    The Koresko Defendants were aware of the valid and beneficial business relationships that existed between Plaintiffs and the Business Relationship Parties.

104.    The Koresko Defendants made false, defamatory and disparaging statements regarding the quality of Plaintiffs' products, services and integrity.

105.    These statements were made with knowledge that they were false or with reckless disregard of the truth. The statements were made with malice and with intent of destroying Plaintiffs' reputation and business.

106.    The Koresko Defendants instituted frivolous lawsuits or assisted in the commencement and prosecution of such lawsuits for the sole purpose of damaging Plaintiffs in the marketplace.

107.    The Koresko Defendants were without privilege or justification to make the defamatory and disparaging statements or to institute the frivolous lawsuits.

108.    The Koresko Defendants' statements and actions were not privileged because they employed improper means to protect their own economic interests as a competitor of Plaintiffs.

109.    The Koresko Defendants were motivated by malice and improperly interfered with Plaintiffs' beneficial business relationships.

110.    By these means, the Koresko Defendants intentionally and unjustifiably induced many of the Business Relationship Parties to sever their beneficial business relationship with Plaintiffs.

111.    Directly by reason of the Koresko Defendants' intentional interference with these valid and beneficial business relationships, Plaintiffs have been and continue to be greatly injured financially, as well as injured in name and reputation.

WHEREFORE, Plaintiffs respectfully pray for judgment against defendants in an amount in excess of $100,000 in compensatory damages and an amount in excess of $100,000 in punitive damages.  Plaintiffs also request such other and further relief, including attorneys' fees and costs, as this Court may deem just and proper.

## COUNT V
### (Tortious Interference with Prospective Economic Advantages)
**Plaintiffs v. Koresko, Lawrence Koresko and the Koresko Institutional Defendants**

112.    Plaintiffs incorporate and reallege the allegations contained in paragraphs 1 through 109 as if fully set forth herein.

113.   Plaintiffs had a reasonable expectation of entering into valid business relationships with countless potential insurance carriers, insurance brokers and 419 Plan employers and participants because they had a long and successful relationship with The Hartford prior to the Koresko Defendants' interference.

114.   The Koresko Defendants knew, or should have known, of Plaintiffs' expectation of entering into these valid business relationships.

115.   The Koresko Defendants intentionally and unjustifiably interfered (or assisted such interference) with Plaintiffs' legitimate expectation of entering into these valid business relationships through the conduct described above.

116.   The Koresko Defendants were without privilege or justification to make the defamatory and disparaging statements or to institute the frivolous lawsuits.

117.   The Koresko Defendants' statements and actions were not privileged because they employed improper means to protect their own economic interests as a competitor of Plaintiffs.

118.   The Koresko Defendants were motivated by malice and improperly interfered with Plaintiffs' beneficial business relationships.

119.   The Koresko Defendants' purposeful interference prevented Plaintiffs' legitimate expectancy from ripening into valid business relationships.

120.   The Koresko Defendants' purposeful interference has damaged and continues to damage Plaintiffs.

WHEREFORE, Plaintiffs respectfully pray for judgment against defendants in an amount in excess of $100,000 in compensatory damages and an amount in excess of $100,000 in

punitive damages.  Plaintiffs also request such other and further relief, including attorneys' fees

and costs, as this Court may deem just and proper.

## COUNT VI

### (Aiding and Abetting the Koresko Defendants' Interference with Present and Future Business Relationships)
### Plaintiffs v. Miller and Anderson Kill

121.    Plaintiffs incorporate and reallege the allegations contained in paragraphs 1 through

118 as if fully set forth herein.

122.    The Koresko Defendants unlawfully interfered with Plaintiffs' current and

prospective business relationships as set forth in Counts IV and V.

123.    As described more fully above, Miller and Anderson Kill committed various tortious

acts in concert with the Koresko Defendants pursuant to a common design to injure

Plaintiffs, their competitor, through the interference with present and future business

relationships.  Alternatively, Miller and Anderson Kill gave substantial assistance to

Koresko to accomplish his unlawful defamation of Plaintiffs including, inter *alia*, helping

him obtain an *ex parte* TRO under false circumstances that could be used by Koresko to

unlawfully interfere with Plaintiffs' current and future business relationships and also

helping to prosecute the Sanchez & Daniels case in Illinois even after withdrawing as

counsel due to a conflict of interest.

124.    As a result of Miller and Anderson Kill's concerted activity with the Koresko

Defendants to unlawfully interfere with Plaintiffs' current and future business relationships

and/or the substantial assistance provided to the Koresko Defendants by Miller and

Anderson Kill to unlawfully interfere with Plaintiffs' current and future business relationships, Plaintiffs have been significantly damaged.

WHEREFORE, Plaintiffs respectfully pray for judgment against defendants in an amount in excess of $100,000 in compensatory damages and an amount in excess of $100,000 in punitive damages. Plaintiffs also request such other and further relief, including attorneys' fees and costs, as this Court may deem just and proper.

### COUNT VII
(Abuse of Process – Sanchez & Daniels Action/Illinois Action)
STEP Services, Bursey, Benistar Services, Benistar Admin Services, Inc., BIGI v. Koresko, Lawrence Koresko, the Koresko Institutional Defendants, Miller, Anderson Kill

125.    Plaintiffs incorporate and reallege the allegations contained in paragraphs 1 through 122 as if fully set forth herein.

126.    By the conduct more fully described above, the Koresko Defendants, Miller and Anderson Kill abused the legal process against Plaintiffs primarily to accomplish a purpose for which the process was not designed.

127.    By obtaining an *ex parte* TRO in the Sanchez & Daniels Action under false pretenses in order to spread defamatory and disparaging statements to third party business clients of Plaintiffs and not to thwart any real imminent harm to Sanchez & Daniels, the Koresko Defendants, Miller and Anderson Kill perverted the legal process.

128.    By falsely fashioning their lawsuit as an ERISA claim when they had information and knowledge that 419 plans are not subject to ERISA since they claim that their own 419 plan is not subject to ERISA, the Koresko Defendants, Miller and Anderson Kill perverted the legal process.

129.    By continuing to bring a purported "class action" in the Illinois Action on behalf of

Sanchez & Daniels and continuing to obtain the same meritless injunctive relief as had been

dissolved by Judge Davis in the Pennsylvania Action, the Koresko Defendants, Miller and

Anderson Kill abused the legal process.

130.    By continuing to provide Koresko with legal help even after withdrawing as counsel

due to a conflict of interest, Miller and Anderson Kill abused the legal process.

131.    As a consequence, Plaintiffs have suffered the severe harm described above.

WHEREFORE, Plaintiffs respectfully pray for judgment against defendants in an amount

in excess of $100,000 in compensatory damages and an amount in excess of $100,000 in

punitive damages.  Plaintiffs also request such other and further relief, including attorneys' fees

and costs, as this Court may deem just and proper.

## COUNT VIII
### (Malicious Prosecution – Sanchez & Daniels Action)
### STEP Services, Bursey, Benistar Services, Benistar Admin Services, Inc., BIGI v. Koresko, Lawrence Koresko, the Koresko Institutional Defendants, Miller, Anderson Kill

132.    Plaintiffs incorporate and reallege the allegations contained in paragraphs 1 through

129 as if fully set forth herein.

133.    By the conduct more fully described above, Koresko, the Koresko Law Firm, Miller

and Anderson Kill instituted the Sanchez & Daniels Action against Plaintiffs in the

Philadelphia Court of Common Pleas and sought an *ex parte* temporary restraining order

and preliminary injunction in that action after it was removed to federal court, acted in a

grossly negligent manner or without probable cause and primarily for a purpose other than

that of securing the proper discovery, joinder of parties or adjudication of the claim on which the proceedings were based.

134.   The Philadelphia Court of Common Pleas action, subsequently removed, and the requests for emergency injunctive relief were terminated in Plaintiffs' favor.  Moreover, the Koresko Defendants and Anderson Kill Defendants voluntarily dismissed the Sanchez & Daniels Action and then filed a nearly identical case in Illinois ("Illinois Action"), which was recently settled.

135.   As a consequence of these Defendants' malicious prosecution of the Sanchez & Daniels Action, Plaintiffs have suffered the severe harm described above.

WHEREFORE, Plaintiffs respectfully pray for judgment against defendants in an amount in excess of $100,000 in compensatory damages and an amount in excess of $100,000 in punitive damages.  Plaintiffs also request such other and further relief, including attorneys' fees and costs, as this Court may deem just and proper.

## COUNT IX
### (Abuse of Process – Arrow Litigation)
**Benistar Services and Benistar Admin. v. Koresko, Lawrence Koresko, the Koresko Institutional Defendants, Miller, Anderson Kill, Arrow Drilling and Nestor Garza**

136.   Plaintiffs incorporate and reallege the allegations contained in paragraphs 1 through 133 as if fully set forth herein.

137.   By the conduct more fully described above, the Koresko Defendants, Miller, Anderson Kill, Arrow Drilling and Garza abused the legal process against Plaintiffs primarily to accomplish a purpose for which the process was not designed.

138.    By filing a frivolous lawsuit on behalf of a company (Palm Valley) that never authorized litigation to be commenced in its name in order to further their scheme to destroy the Plaintiffs' business reputation and business, the Koresko Defendants, Miller and Anderson Kill perverted the legal process.

139.    By instituting a lawsuit on behalf of Arrow Drilling who was not a participant, beneficiary or fiduciary of the Benistar Plan and who clearly did not have standing to sue, the Koresko Defendants, Miller and Anderson Kill perverted the legal process.

140.    By falsely fashioning their lawsuit as an ERISA claim when they had information and knowledge that 419 plans are not subject to ERISA since they claim that their own 419 plan is not subject to ERISA, the Koresko Defendants, Miller and Anderson Kill perverted the legal process.

141.    By agreeing to be nominal plaintiffs in a meritless lawsuit filed by the Koresko Defendants, Miller and Anderson Kill against Benistar Services and Benistar Admin and knowing that the lawsuit was instituted merely in furtherance of the Koresko Defendants and Anderson Kill's scheme to destroy and eliminate Koresko's competition in the 419 plans market, Arrow Drilling and Garza perverted the legal process.

142.    As a consequence, Plaintiffs have suffered the severe harm described above.

WHEREFORE, Plaintiffs respectfully pray for judgment against defendants in an amount in excess of $100,000 in compensatory damages and an amount in excess of $100,000 in punitive damages. Plaintiffs also request such other and further relief, including attorneys' fees and costs, as this Court may deem just and proper.

## COUNT X
### (Malicious Prosecution – Arrow Litigation)
**Benistar Services and Benistar Admin. v. Koresko, Lawrence Koresko, the Koresko Institutional Defendants, Miller, Anderson Kill, Arrow Drilling and Nestor Garza**

143.    Plaintiffs incorporate and reallege the allegations contained in paragraphs 1 through 140 as if fully set forth herein.

144.    By the conduct more fully described above, Koresko, the Koresko Law Firm, Miller, Anderson Kill, Arrow Drilling and Nestor Gaza, in instituting the Arrow Litigation against Benistar in the Philadelphia federal court, acted in a grossly negligent manner or without probable cause and primarily for a purpose other than that of securing the proper discovery, joinder of parties or adjudication of the claim on which the proceedings were based.

145.    This action was recently terminated in Plaintiffs' favor when the Third Circuit affirmed the District Court's dismissal of the case for lack of subject matter jurisdiction.

146.    As a consequence of these Defendants' malicious prosecution of the Arrow Litigation, Plaintiffs have suffered the severe harm described above.

WHEREFORE, Plaintiffs respectfully pray for judgment against defendants in an amount in excess of $100,000 in compensatory damages and an amount in excess of $100,000 in punitive damages. Plaintiffs also request such other and further relief, including attorneys' fees and costs, as this Court may deem just and proper.

## COUNT XI
### (Civil Conspiracy)
### Plaintiffs v. All Defendants

147.    Plaintiffs incorporate and reallege the allegations contained in paragraphs 1 through 144 as if fully set forth herein.

148.    All Defendants agreed to and/or understood that they were participating in Koresko's unlawful scheme to injure Plaintiffs, his competitors, through the institution of frivolous litigation and the use of the frivolous litigation as a basis to spread false and defamatory information about the Plaintiffs that significantly injured their business reputation and substantially interfered with their current and future business relationships.

149.    In furtherance of this unlawful objective, all Defendants, acting in concert, committed one or more overt acts as set forth in detail above.  For example,

(a)  Miller and Anderson Kill acted as co-counsel in obtaining a baseless and *ex parte* TRO in the Sanchez & Daniels case, filed other various frivolous lawsuits with Koresko and Miller even continued to act as "counsel" in the Illinois Action even after her law firm withdrew due to a conflict of interest as a result of its representation of one of the institutional defendants in an unrelated matter.

(b)  Community Trust and Lowell Gates agreed to be named as the proposed trustee for the STEP Plan assets that Koresko sought to be transferred pursuant to the bogus TRO and requests for injunctive relief in the Sanchez & Daniels Pennsylvania case and Illinois case.

(c)  Arrow Drilling and Nestor Garza agreed to act as nominal plaintiffs in frivolous litigation spearheaded by Koresko that was dismissed by the District Court as without basis.

Upon information and belief, Arrow Drilling and Nestor Garza knew of and aided and abetted in the Koresko Defendants' interference with Plaintiffs' contractual relations and making of defamatory statements against Plaintiffs.

(d)  Koresko and Lawrence Koresko were partners with and/or in Capitas and worked with other Capitas partners to help Koresko with their spurious and frivolous lawsuits to defame and disparage Benistar and STEP.

As a result of all the Defendants' concerted activity and participation in the conspiracy to injure Plaintiffs' business through unlawful means, Plaintiffs have been significantly damaged.

WHEREFORE, Plaintiffs respectfully pray for judgment against defendants in an amount in excess of $100,000 in compensatory damages and an amount in excess of $100,000 in punitive damages.  Plaintiffs also request such other and further relief, including attorneys' fees and costs, as this Court may deem just and proper.


THORP REED & ARMSTRONG, LLP

BY:  _____
     IRA B. SILVERSTEIN
     Attorney for Plaintiffs


DATED: April 13, 2006

<u>**VERIFICATION**</u>

I, Wayne H. Bursey, President of STEP Plan Services, Inc., verify that the statements made in the foregoing Second Amended Complaint are, to the best of my knowledge, true and correct. I understand that false statements made herein are subject to the penalties of 18 Pa. C.S.A. §4904 relating to unsworn falsification to authorities.

Wayne H Bursey

WAYNE H. BURSEY

President, STEP Plan Services, Inc.

Dated: April 13, 2006

## CERTIFICATE OF SERVICE

I, Ira B. Silverstein, Esquire, hereby certify that I caused a true and correct copy of

Plaintiffs' Amended Complaint, to be served on this date upon the following by first class mail,

postage prepaid:

Edward M. Dunham, Jr., Esq.
Duane Morris, LLP
One Liberty Place-40th Fl.
Philadelphia, PA 19103-7396
Atty for Anderson Kill & Olick, P.C.
and Virginia Miller

John J. Koresko, V, Esq.
Koresko & Associates, P.C.
200 W. Fourth Street
Bridgeport, PA 19405
Atty for the Koresko Defendants

Steven D. Johnson, Esq.
Hecker Brown Sherry and Johnson, LLP
1700 Two Logan Square
18th & Arch Streets
Philadelphia, PA 19103-2769
Atty for Capitas Financial, LLC

Albert N. Peterlin, Esq.
Gates, Halbruner & Hatch, P.C.
1013 Mumma Road – Suite 100
Lemoyne, PA   17043
Atty for Lowell R. Gates
and Community Trust Company

Nestor Garza, Jr.
P.O. Box 505
Benavides, TX  78341

Arrow Drilling Co., Inc.
P.O. Box 505
Benavides, TX  78341

By: _____
        IRA B. SILVERSTEIN

DATED:  April 13, 2006

P0033740.DOC

49

IN THE COURT OF COMMON PLEAS
PHILADELPHIA COUNTY

| | |
|---|---|
| STEP PLAN SERVICES, INC., *et al.* : | |
| Plaintiffs, : | |
| v. : | CIVIL ACTION |
| : | |
| JOHN J. KORESKO, V, *et al.* : | MARCH TERM 2004 |
| Defendants. : | NO. 7718 |

## ATTORNEY AFFIDAVIT OF SUNAH PARK

I, Sunah Park, being duly sworn according to law, state the following under penalty of

perjury:

1.    I am a Partner in the firm of Thorp Reed & Armstrong, LLP.

2.    I am counsel of record to Plaintiffs.

3.    By checking the docket in the above captioned matter on this date, I learned of the filing of a Praecipe for Non Pros filed by the Koresko Defendants.

4.    I also learned, by checking the docket, that the requested judgment was entered by the Prothonotary against Plaintiffs.

5.    As of this date, Plaintiffs have not been served, through me or through my partner, Ira B. Silverstein, Esquire, with the Praecipe, despite the fact that the Praecipe was filed with a Certificate of Service indicating that it was being served by First Class Mail on November 14, 2007.

6.    The Office of the Prothonotary has advised that the only record of the judgment entered is the docket entry reflecting the same.

Date:   November 19, 2007

_____
Sunah Park, Esquire

SWORN TO AND SUBSCRIBED BEFORE ME
this _14th_ day of _November_, 2007

_____
NOTARY PUBLIC

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
VIVIAN PEARL, Notary Public
City of Philadelphia, Phila. County
My Commission Expires February 24, 2011

P0045744.DOC